**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

UNITED STATES OF AMERICA

v.

JARRED RYAN CORKER,

　　　　　　　Defendant.

CRIMINAL CASE NO.

1:13-CR-00057-TWT-JFK

## REPORT AND RECOMMENDATION

Pending before the court is Defendant Jarred Ryan Corker's motion [Doc. 15] to suppress evidence seized on April 23, 2012. An evidentiary hearing was held on the motion on May 14, 2013. [Doc. 22].[1] Defendant contends that law enforcement officers lacked the necessary probable cause to place him under arrest; therefore, the evidence seized during a subsequent search of his person and his vehicle must be suppressed as fruits of an unlawful arrest. [Doc. 24]. Defendant makes no other argument concerning the reasonableness of the searches following his arrest. [Id.]. The Government responds that the arresting officers had probable cause to arrest Defendant for multiple traffic offenses, that the subsequent search of his person incident to arrest was lawful, and that the search of the vehicle was a lawful inventory search. [Doc. 25].

---

[1]Citations to the transcript are:  (Tr. at ).

After consideration of the totality of the circumstances, the court recommends that Defendant's motion to suppress be denied.

## I.    Facts

On April 23, 2012, Officer Andrew Taddei, City of Atlanta Police Department ("APD"), was working an off-duty job as security officer at the Lenox Mall, in Atlanta, Georgia.[2]  (Tr. at 7-10).  Officer Taddei had worked with APD since 2001, primarily handling various traffic related duties throughout his employment.[3]  (Tr. at 4-5).  On April 23, at approximately 6:00 p.m., Officer Taddei was operating a mall security vehicle, an SUV, which is not marked and does not have blue lights, when he received a report from a dispatcher at the mall that a shoplifting incident had occurred in the Champs store located in the mall.  The suspect was described as a black male wearing a black hooded sweat shirt.  (Tr. at 10-12).  In the vicinity of the parking deck located closest to that store, on Ring Road which loops around the mall, the officer observed

---

[2]Officer Taddei had received authorization to work this off-duty job and had been employed at Lenox Mall working security for ten to eleven years.  While working this job, the officer wears his APD uniform.  (Tr. at 7-9).  And Officer Taddei retains his arrest powers while off-duty.  (Tr. at 9).

[3]The officer had received extensive training related to his duties as a patrol officer, including how to conduct traffic stops.  During his work as an APD officer, he had conducted hundreds of traffic stops which included fifteen to twenty stops a month involving reckless driving violations.  (Tr. at 5-7).

2

a black male wearing a black hooded sweat shirt operating a silver Buick. (Tr. at 11-12, 50). The black male was also wearing a black ball cap with a white logo. Officer Taddei contacted the mall dispatcher to inquire about the ball cap and was advised that the shoplifting suspect had been wearing a cap matching that description. (Tr. at 12-13, 53-54).

Officer Taddei initially was driving beside the silver Buick and noticed that the driver, the sole occupant, repeatedly looked over at him and continued to watch him in the side and rear view mirrors when the officer dropped back behind the Buick to attempt to get the tag number. (Tr. at 12-14, 52). The Buick exited the mall property, taking a right onto Lenox Road, with the officer continuing to follow and the driver continuing to look back at him. (Tr. at 14; Def. Ex. 2).

At the stop light at the intersection of Lenox Road and East Paces Ferry Road, while waiting for the light to change, the driver of the Buick repeatedly looked back at Officer Taddei. (Tr. at 15, 53; Def. Ex. 2). Based on his observations and because he was in an unmarked mall security vehicle, the officer contacted APD dispatch to request that a marked unit be available to make a traffic stop if necessary. (Tr. at 15). When the light turned green, the Buick continued on Lenox Road, which then became one lane in each direction, and "there is a center lane that is specifically marked for left

3

turn only into a neighborhood off Lenox Road." (Tr. at 16-17, 55; Def. Ex. 2). The Buick entered that left turn only lane and traveled the entire length but failed to make a left turn, which constituted improper lane usage. (Tr. at 17, 55). When the left turn lane ended, the Buick continued straight, using the lane on the wrong side of Lenox Road, heading into oncoming traffic and causing other vehicles to swerve off the road. (Tr. at 7-19, 56; Def. Ex. 2). The officer was approximately thirty car lengths behind the Buick and could clearly observe the Buick. (Tr. at 18). Because the Buick was being operated recklessly, the vehicle needed to be stopped. (Tr. at 19-20).

The Buick returned to the right side of Lenox Road, as the officer attempted to catch up. (Tr. at 20). The Buick then entered another clearly marked center turn lane that is used for traffic proceeding in both directions to make left hand turns. (Tr. at 20-21, 57; Def. Ex. 2). And, again, when that center turn lane ended, the Buick did not make a left hand turn but continued straight on the wrong side of Lenox Road. The vehicle also increased speed. The oncoming, rush hour traffic was heavier. (Tr. at 21-22). Officer Taddei, following approximately ten car lengths behind, had a clear view of the Buick. (Tr. at 23). The Buick then made a right hand turn, from the wrong side of Lenox Road, crossing in front of other traffic in the proper lane, onto the Canterbury Road. (Tr. at 23; Def. Ex. 2). The officer followed at a distance of approximately two-

4

hundred feet.  (Tr. at 23-24).  Canterbury is a narrow, curved road, with one lane of traffic in each direction, and the Buick began passing vehicles, using the wrong side of the road.  (Tr. at 24).

By this time several officers in marked APD patrol vehicles had responded, including, Officer Epps, who was waiting on Pine Tree, the only road exiting off of Canterbury, which is a dead end street.  (Tr. at 25; Def. Ex. 2).  The Buick turned onto Pine Tree, also one lane of traffic in each direction, and continued past Officer Epps' marked patrol unit.  Officer Epps began following the vehicle, activating his blue lights and siren.  (Tr. at 26-27).  Officer Taddei was also following behind Officer Epps.  (Tr. at 27-28).  The Buick did not stop but continued on to the end of Pine Tree, at the intersection with Sidney Marcus Boulevard, where rush hour traffic blocked the Buick from proceeding further.  (Tr. at 27-28).  Officers Epps and Taddei stopped just behind the Buick.  (Tr. at 28; Gov't Ex. 4).

The officers exited their vehicles and approached the driver's side of the Buick.  Officer Taddei opened the door and advised the driver, identified as Defendant Corker, to turn-off the vehicle and to exit.  (Tr. at 29-30, 58).  The officer observed on the passenger seat a large quantity of cash.  (Tr. at 29-30, 58).  And, as Defendant was removed from the Buick, the officer also observed a stack of credit cards on the edge

5

of the driver's seat.  (Tr. at 30).  The officers handcuffed Defendant, who was wearing a black ball cap with a white logo, a black hooded sweat shirt and jeans, and arrested him for reckless driving.  (Tr. at 30-31, 59).  Incident to arrest, the officer removed Defendant's wallet and checked his pockets, finding another large quantity of cash, approximately $2,800, and three ATM receipts.  (Tr. at 31-32, 59; Gov't Ex. 3 at 4).

Based on these observations, Officer Taddei contacted the Zone 2 CID,[4] and Sgt. S. Ormond responded, along with Investigator D. Bahry.  (Tr. at 32, 60; Gov't Ex. 3 at 3-4).  After the officers explained what had occurred, Sgt. Ormond and Investigator Bahry authorized impounding the vehicle because of Defendant's arrest and holding the vehicle for the Forfeiture Investigative Unit ("FIU") based on the credit cards observed in the Buick.  (Tr. at 32-33).  As of this time, the Buick had not been searched. (Tr. at 33).

Officer Taddei testified that APD had standard operating procedures for impounding vehicles as a result of traffic stops and identified a copy of those procedures.  (Tr. at 33; Gov't Ex. 1).  Section 4.13.2 provides that vehicles, even

---

[4]Although not in the record, the court understands "CID" to be the Criminal Investigation Division.

6

without supervisory approval, may be impounded under the circumstances set forth in pertinent part in section 4.13.6:

    1.    The driver is arrested . . ., and:

        a.    The operator refuses to release the vehicle to a person of his or her own choosing who is present . . . or there is no such person present.

        b.    The vehicle is not parked at his or her residence or property.

(Tr. at 34-36; Gov't Ex. 1).  After impounding a vehicle and prior to releasing the vehicle to the tow truck company, the procedures also provide for conducting an inventory of the contents of the vehicle and the preparation of an incident and impound report.  (Tr. at 36-38; Gov't Ex. 1).  Officer Taddei testified that the inventory is conducted to protect APD from liability for valuables that might otherwise be left in the vehicle.  (Tr. at 38-39).  The procedures, in pertinent part, provide in section 4.13.9:

    1.    An incident report and Impound Report . . . will be completed for each impounded vehicle. . . .

    2.    Every impounded vehicle will be inventoried prior to its release to the wrecker service.  <u>All property that is considered "valuable" will be removed, inventoried, and turned into the Property Control Unit.</u>

    3.    If upon conducting the inventory, the officers finds a container, which is unsealed but accessible (i.e., box, suitcase, briefcase, etc.), he or she will open the container to inventory the contents.

7

(Tr. at 36, 38-40; Gov't Ex. 1) (emphasis in original).  Within approximately fifteen minutes of the stop and arrest of Defendant,[5] Officer Taddei conducted the inventory search of the Buick and seized the currency, totaling $4,300, in twenty-dollar bills, previously observed on the passenger seat, the credit cards, which were Visa Debit Cards issued by "Turbo Tax," previously observed on the driver's seat, and a couple of ATM receipts.  (Tr. at 39-40, 61; Gov't Ex. 3 at 4).  The officers completed both an Impound Report and an incident report.  (Tr. at 36, 40; Gov't Exs. 2, 3).  Defendant was subsequently issued citations for traffic violations, including, reckless driving, O.C.G.A. § 40-6-390, improper use of central turn lane, O.C.G.A. § 40-6-126, and driving on the wrong side of the road, O.C.G.A. § 40-6-40, and citations for other violations involving financial transaction card fraud and theft, O.C.G.A. §§ 16-9-31 and 16-9-33.  (Tr. at 47, 61; Gov't Ex. 9).

Additional facts will be set forth as necessary during discussion of the motion to suppress.

---

[5]During this time, Defendant was secured in Officer Epps' patrol vehicle.  (Tr. at 39, 60).

8

## II.    Discussion

Defendant contends that the items seized as a result of the search of his person incident to arrest and as a result of the inventory search of the Buick should be suppressed because the officers did not have probable cause to arrest him for reckless driving or for financial transaction card possession.[6]   Because he was unlawfully arrested, Defendant argues that the subsequent searches were tainted and that the items seized are fruits of the unlawful arrest.   [Doc. 24].   Defendant makes no further argument challenging either the search of his person or of his vehicle.   [Id.].   Although the Government makes a number of alternative arguments, because the court finds that the officers had probable cause to conduct the traffic stop and arrest Defendant, because the search of Defendant's person was a lawful search incident to that arrest, and because the officers conducted a valid inventory search of the Buick, those additional arguments will not be addressed.   [Doc. 25].

---

[6]Because the court finds that the officers had probable cause to arrest Defendant on the traffic violations, the court need not and does not address whether probable cause existed at the time of the stop to arrest Defendant for financial transaction card offenses.

9

**A.     Probable Cause for Arrest**

"A traffic stop, which 'is a seizure within the meaning of the Fourth Amendment,' . . . 'is constitutional if it is either based upon probable cause to believe a traffic violation has occurred or justified by reasonable suspicion in accordance with Terry[v. Ohio, 88 S. Ct. 1868 (1968)].'" United States v. Spoerke, 568 F.3d 1236, 1248 (11th Cir. 2009) (citations omitted).  As the Eleventh Circuit Court of Appeals stated in United States v. Cooper, 133 F.3d 1394 (11th Cir. 1998), "law enforcement 'may stop a vehicle when there is probable cause to believe that the driver is violating any one of the multitude of applicable traffic and equipment regulations relating to the operation of motor vehicles.'" Id. at 1398 (quoting United States v. Strickland, 902 F.2d 937, 940 (11th Cir. 1990)); see also United States v. Terry, 220 Fed. Appx. 961, 963 (11th Cir. 2007) (same).  And "[w]hen determining whether an officer had probable cause to believe that a traffic violation occurred, the 'officer's motive in making the traffic stop does not invalidate what is otherwise objectively justifiable behavior under the Fourth Amendment.'"  United States v. Harris, 526 F.3d 1334, 1337 (11th Cir. 2008) (citation omitted).

In Craig v. Singletary, 127 F.3d 1030 (11th Cir. 1997), the Eleventh Circuit Court of Appeals stated:

10

> Probable cause to arrest exists when the facts and circumstances within the collective knowledge of law enforcement officers, or of which they have reasonably trustworthy information, would cause a prudent person to believe that the suspect has committed or is committing an offense. . . . Because "sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment" . . . "probable cause itself is a doctrine of reasonable probability and not certainty[.]"

Id. at 1042 (citations omitted); see also United States v. Lindsey, 482 F.3d 1285, 1290, 1291 (11th Cir. 2007) ("Probable cause to arrest exists when the totality of the facts and circumstances support 'a reasonable belief that the suspect had committed or was committing a crime.'") (citation omitted).  Thus, "[s]ince a finding of probable cause requires only a probability of criminal activity . . . a court assessing probable cause in hindsight must assess both the totality of the circumstances and the inferences that flow from those circumstances."  United States v. Wai-Keung, 845 F. Supp. 1548, 1557 (S.D. Fla. 1994), aff'd, 115 F.3d 874 (11th Cir. 1997) (citations omitted).  And probable cause "'must be judged not with clinical detachment, but with a common sense view to the realities of normal life.'"  Craig, 127 F.3d at 1042 (citation omitted).

11

Officer Taddei had probable cause to arrest Defendant for the traffic offenses of reckless driving, O.C.G.A. § 40-6-390,[7] driving on the wrong side of the road,[8] and misuse of the center turn lane, O.C.G.A. § 40-6-126.[9]  Because the traffic offenses involving misuse of the center turn lane and driving on the wrong side of the road contribute to the finding that Defendant was driving recklessly, the court will focus on the probable cause for the reckless driving offense.

Officer Taddei[10] testified that, after Defendant exited Lenox Mall property onto Lenox Road, Defendant stopped at a red light at the intersection with East Paces Ferry Road.  (Tr. at 15, 53; Def. Ex. 2).  When the light turned green, Defendant continued

---

[7]This provision provides:  "Any person who drives any vehicle in reckless disregard for the safety of persons or property commits the offense of reckless driving." O.C.G.A. § 40-6-390(a).

[8]This provision states in pertinent part:  "Upon all roadways of sufficient width, a vehicle shall be driven upon the right half of the roadway . . . ."  O.C.G.A. § 40-6-40(a).  The exceptions to this provision are not applicable to the conduct charged in this case.  See O.C.G.A. §§ 40-6-40(a)(1-4), (b)-(d).

[9]This provision provides in pertinent part:  "Whenever a highway or roadway has a central lane in which traffic may enter from either direction for the purposes of making a left turn, no vehicle shall be driven into such central lane except for the purpose of making a left turn . . . ."  O.C.G.A. § 40-6-126.

[10]The undisputed evidence demonstrates that the officer personally observed each of the incidents underlying the charge for reckless driving.  (Tr. at 14, 18, 20, 23, 24, 26, 28).

12

on Lenox Road, which then became one lane in each direction, and "there is a center lane that is specifically marked for left turn only into a neighborhood off Lenox Road." (Tr. at 16-17, 55; Def. Ex. 2). Defendant entered that left turn only lane and traveled the entire length but failed to make a left turn, which constituted improper lane usage and the first traffic offense. (Tr. at 17, 55). When the left turn lane ended, Defendant continued straight, using the lane on the wrong side of Lenox Road, heading into oncoming traffic and causing other vehicles to swerve off the road. (Tr. at 7-19, 56; Def. Ex. 2). This act is the next traffic offense committed by Defendant.

Defendant returned to the right side of Lenox Road. (Tr. at 20). He then entered another clearly marked center turn lane that is used for traffic proceeding in both directions to make left hand turns. (Tr. at 20-21, 57; Def. Ex. 2). And, again, when that center turn lane ended, Defendant did not make a left hand turn but continued straight on the wrong side of Lenox Road. He also increased speed. The oncoming traffic was heavier. (Tr. at 21-22). These are acts constituting additional traffic offenses by Defendant. Defendant then made a right hand turn, from the wrong side of Lenox Road, crossing in front of other traffic in the proper lane, onto the Canterbury Road. (Tr. at 23; Def. Ex. 2). Canterbury is a narrow, curved road, with one lane of traffic in each direction, and Defendant began passing vehicles, using the wrong side of the road.

13

(Tr. at 24).  This is additional conduct by Defendant constituting reckless driving.  He turned onto Pine Tree, also one lane of traffic in each direction, and continued past Officer Epps' marked patrol unit.  Officer Epps began following the vehicle, activating his blue lights and siren.  (Tr. at 26-27).  Defendant did not stop, arguably another violation, but continued on to the end of Pine Tree, at the intersection with Sidney Marcus Boulevard, where rush hour traffic blocked Defendant's Buick from proceeding further.  (Tr. at 27-28).

Defendant operated his vehicle in disregard for the safety of other persons and property.  He drove on the wrong side of the road, not once but twice, into oncoming rush-hour traffic causing that traffic to swerve to avoid colliding with him.[11]  He misused the center left turn lane, also on two occasions.  From the wrong lane of traffic, Defendant cut across traffic, which was in the proper traffic lane, to make a right hand turn.  And, on a narrow and curving road, he sped around other traffic.  Based on Officer Taddei's testimony concerning Defendant repeatedly looking back at him (Tr. at 12, 14-15, 52-53), it is reasonable to conclude that Defendant drove in this reckless

---

[11]See Parker v. State, 317 Ga. App. 93, 95, 730 S.E.2d 717, 719 (2012) (finding violation of O.C.G.A. § 40-6-40 when the officer testified that he observed the defendant "cross the solid double yellow line and then drive on the wrong side of the road").

14

manner while attempting to elude law enforcement.  This establishes probable cause for the traffic stop.  See Upshaw v. State, 264 Ga. App. 878, 879, 592 S.E.2d 523, 524-25 (2003) (evidence that collision occurred after the defendant passed another vehicle and was driving on the wrong side of curved road constituted reckless driving); State v. Burrell, 263 Ga. App. 207, 208, 587 S.E.2d 298, 300 (2003) ("the State needed only to present evidence showing that defendant drove his car in a manner exhibiting reckless disregard for the safety of persons or property"); Brackins v. State, 249 Ga. App. 788, 789, 549 S.E.2d 775, 777 (2001) (finding evidence sufficient to prove that the defendant "was guilty of reckless driving and attempting to elude the officer when he led the officer on a high-speed chase driving on the wrong side of the road and wilfully failed to bring his car to a stop after the officer activated his patrol car's blue lights and siren").  And, once this traffic offense was observed, the officers had the right to stop and arrest Defendant for reckless driving.  See Mackey v. State, 296 Ga. App. 675, 676, 675 S.E.2d 567, 569 (2009) (because the police officers personally observed the defendant driving in a reckless manner, "they were authorized to stop [the defendant] and arrest him for reckless driving"); State v. Lowe, 263 Ga. App. 1, 1, 587 S.E.2d 169, 170-71 (2003) (because the officers observed the defendant driving recklessly, they were authorized to make warrantless arrest, "even though the officer could have chosen

15

to issue a citation").[12]  The fact that Officer Taddei was off-duty does not impact his authority to make the arrest for the traffic violations that he personally observed.  See Griffis v. State, 295 Ga. App. 903, 904, 673 S.E.2d 348, 350 (2009).

For these reasons, the court finds that the officers had probable cause to arrest Defendant for the cited traffic offenses.

### B.    Search

As noted, the only challenge that Defendant raises regarding the search of his person and of his vehicle is based on the alleged lack of probable cause for his arrest. [Doc. 24].  Because Defendant's arrest was lawful, Defendant's attack on the searches subsequent to his arrest fails.  The court, however, also finds that the search of Defendant's person and of the Buick did not violate his Fourth Amendment rights.

As a general rule, the Fourth Amendment requires police officers to obtain a warrant before conducting a search.  See California v. Carney, 105 S. Ct. 2066, 2069 (1985).  However, the searches in this case occurred under circumstances that are exceptions to the warrant requirement.

---

[12]See also Draper v. Reynolds, 369 F.3d 1270, 1276 & n.8 (11th Cir. 2004) (because the officer had probable cause to stop the driver for a traffic offense, that probable cause provided basis to arrest the driver and noting that "[t]he parties do not dispute that a custodial arrest may be made for both a misdemeanor offense and traffic violations") (citing Atwater v. City of Lago Vista, 121 S. Ct. 1536, 1557 (2001)).

16

The search of Defendant's person, following his arrest, and the seizure of his wallet, identification, the currency and ATM receipts from Defendant's person as the result of a search incident to lawful arrest are admissible into evidence.  See United States v. Robinson, 94 S. Ct. 467 (1973); Chimel v. California, 89 S. Ct. 2034 (1969). In United States v. Goddard, 312 F.3d 1360 (11th Cir. 2002), the Eleventh Circuit Court of Appeals summarized the reasons for and legal authority supporting a warrantless search of an arrestee incident to that arrest.  The court stated:

> "The justification or reason for the authority to search incident to lawful arrest rests quite as much on the need to disarm the suspect in order to take him into custody as it does on the need to preserve evidence on his person for later use at trial." . . .  Since the custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment, a search incident to arrest requires no additional justification. . . .  In fact, a full search incident to a lawful arrest is *not only* a "reasonable" search under the Fourth Amendment, it is *also* an exception to the warrant requirement. . . .

Id. at 1364 (citations omitted) (emphasis in original).  Accordingly, the items seized from Defendant's person are admissible at trial.

And "[t]he Supreme Court has held that inventory searches, conducted pursuant to an established procedure, but without a warrant, on legally impounded vehicles are valid under the Fourth Amendment." United States v. Glover, 441 Fed. Appx. 748, 751 (11th Cir. 2011) (citing South Dakota v. Opperman, 96 S. Ct. 3092, 3098-99 (1976)).

17

Accordingly, after lawfully taking custody of a vehicle, law enforcement officers may conduct an inventory search of the vehicle in order to protect the owner's property while it is in police custody, to protect the police from claims of lost or stolen property, and to protect the police from potential danger.  See Colorado v. Bertine, 107 S. Ct. 738, 741 (1987); United States v. Jefferson, 451 Fed. Appx. 833, 835 (11th Cir. 2011) (the government must establish "first, that the officers had the authority to impound the defendant's vehicle, and second, that the officers complied with departmental policy in conducting the search").

Because an inventory search must be conducted according to standardized criteria, "an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence."  Florida v. Wells, 110 S. Ct. 1632, 1635 (1990); see also Glover, 441 Fed. Appx. at 752 ("'An inventory search is not a surrogate for investigation, and the scope of an inventory search may not exceed that necessary to accomplish the ends of the inventory.'") (quoting United States v. Khoury, 901 F.2d 948, 958-59 (11th Cir.) (finding that officer's search had no purpose other than investigation and stating that "a warrantless investigatory search may not be conducted under the guise of an inventory"), mod'd on other grounds, 910 F.2d 713 (11th Cir. 1990)).  However, "'the mere expectation of uncovering evidence will not vitiate an

18

otherwise valid inventory search.'" <u>United States v. Crawford</u>, 294 Fed. Appx. 466, 472 (11th Cir. 2008) (quoting <u>United States v. Bosby</u>, 675 F.2d 1174, 1179 (11th Cir. 1979)).  And an inventory search may be as thorough as necessary to accomplish the legitimate caretaking function of the police, that is, conducting a search "for the purpose of 'securing or protecting the car and its contents' . . . ." <u>Glover</u>, 441 Fed. Appx. at 752 (quoting <u>Opperman</u>, 96 S. Ct. at 3098-99).

First, the court finds that the officers had authority to impound Defendant's vehicle and did so in compliance with standard APD criteria.  Section 4.13.2 of the APD procedures, identified in court by Officer Taddei (Tr. at 33), provides that a vehicle may be impounded under the circumstances set forth in section 4.13.6, subsection 1, if the driver is arrested, and:

        a.      The operator refuses to release the vehicle to a person of his or her own choosing who is present . . . or there is no such person present.

        b.      The vehicle is not parked at his or her residence or property.

(Tr. at 34-36; Gov't Ex. 1).  Defendant Corker was arrested.  There was no passenger in the vehicle who could take custody of the Buick.  And the arrest occurred on a city street, not at Defendant's residence in Marietta, Georgia.  (Tr. at 12, 25-27, 30; Gov't Ex. 6).

19

Second, Officers Taddei and Epps complied with the APD procedures in conducting the inventory search. Officer Taddei testified that an inventory is conducted to protect APD from liability for valuables that might otherwise be left in the vehicle. (Tr. at 38-39). The procedures that he relied on provide in section 4.13.9 that:

1.    An incident report and Impound Report . . . will be completed for each impounded vehicle. . . .

2.    Every impounded vehicle will be inventoried prior to its release to the wrecker service. <u>All property that is considered "valuable" will be removed, inventoried, and turned into the Property Control Unit.</u>

3.    If upon conducting the inventory, the officers finds a container, which is unsealed but accessible (i.e., box, suitcase, briefcase, etc.), he or she will open the container to inventory the contents.

(Tr. at 36, 38-40; Gov't Ex. 1) (emphasis in original). The officer conducted the inventory search of the Buick and seized the currency, totaling $4,300, in twenty-dollar bills, previously observed on the passenger seat, the credit cards, which were Visa Debit Cards issued by "Turbo Tax," previously observed on the driver's seat, and a couple of ATM receipts. (Tr. at 39-40, 61; Gov't Ex. 3 at 4). The officers completed both an Impound Report and an incident report. (Tr. at 36, 40; Gov't Exs. 2, 3). Under the facts and circumstances presented in this case, the inventory search conducted on the Buick was reasonable and did not violate Defendant's Fourth Amendment rights.

20

See Jefferson, 451 Fed. Appx. at 835 (citing United States v. Laing, 708 F.2d 1568, 1571 (11th Cir. 1983)).  The items seized from the vehicle are admissible at trial.

## III.    Conclusion

For the forgoing reasons and based on the cited authority, the court **RECOMMENDS** that Defendant's motion [Doc. 15] to suppress be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial.

**IT IS SO ORDERED and DIRECTED**, this 13th day of August, 2013.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

21